J-S13026-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| GLAVIN JUSTAN IVY | : | |
| | : | |
| Appellant | : | No. 1178 WDA 2018 |

Appeal from the Judgment of Sentence Entered March 14, 2017
In the Court of Common Pleas of Mercer County
Criminal Division at No(s):  CP-43-CR-0001780-2014

BEFORE:   BENDER, P.J.E., OTT, J., and STRASSBURGER[*], J.

MEMORANDUM BY OTT, J.:                         **FILED JULY 30, 2019**

Glavin Justan Ivy appeals*, nunc pro tunc*, from the judgment of sentence imposed March 14, 2017, in the Mercer County Court of Common Pleas, made final by the denial of post-sentence motions on August 18, 2017.  The trial court sentenced Ivy to an aggregate term of 19 to 60 years' imprisonment following his jury conviction of rape, kidnapping, aggravated assault,[1] and related charges for the November 2014 assault of his ex-girlfriend, A.C.  The court also determined Ivy met the criteria for classification as a sexually violent predator ("SVP") pursuant to Pennsylvania's Sexual Offender Registration and Notification Act ("SORNA").[2]  On appeal, Ivy challenges both

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] **See** 18 Pa.C.S. §§ 3121(a)(1), 2901(a)(3), and 2701(a)(1), respectively.

[2] **See** 42 Pa.C.S. §§ 9799.10-9799.41.

the sufficiency and weight of the evidence supporting his convictions, and asserts the Commonwealth committed prosecutorial misconduct in several respects. For the reasons below, we are constrained to vacate Ivy's sentence, in part, and remand for further proceedings. In all other respects, we affirm.

In its opinion, the trial court provided a detailed recitation of the evidence presented during Ivy's jury trial, which we will not reiterate herein. *See* Trial Court Opinion, 2/26/2018, at 4-28. In summary, we note, as did the trial court, "this was an unusual rape case." *Id.* at 4. Ivy and A.C. met on a dating website, and dated for about two weeks before the incident that led to the present charges. During those two weeks, they engaged in consensual sexual intercourse.

On November 17, 2014, Ivy became enraged because of pictures on A.C.'s Facebook page, and engaged in a heated conversation with her online. During that argument, Ivy belittled A.C. and called her names.[3] *See* N.T., 11/17/2016 at 11-34. In an attempt to salvage their relationship, A.C. went to Ivy's apartment on the evening of November 18, 2014. Shortly after she arrived, Ivy led A.C. into his bedroom and locked the door. He called her a "stupid bitch," and forcibly pushed her back onto the bed when she rose to leave. *Id.* at 50. The two continued to argue over the Facebook posts and

---

[3] Ivy referred to A.C. as, *inter alia*, a "slut," "lying dirty skank," "ugly bitch," and "whore," and repeatedly told her to kill herself. *See* N.T., 11/17/2016, at 14-16, 20, 18, 21, 23, 28.

Ivy then physically assaulted A.C., striking her twice in the face, choking her until she began to blackout,[4] and pulling her hair so hard she began to cry. Ivy then began to cry too, and apologized. After he had calmed down, the two talked and joked for a while before Ivy suggested they have sex. A.C. agreed, and removed her clothes herself. She explained: "I was afraid that he would take it from me forcefully or hurt me further so I agreed just so that I wouldn't get hurt any more." *Id.* at 99. Ivy then raped her. He agreed to let her leave around 3:00 a.m. so that she could go home to get ready for work. After work, A.C. went to her parents' house and showed them the bruises on her neck. Her parents insisted she report the incident to police, which she did. A.C. also obtained a Protection from Abuse ("PFA") order against Ivy on December 16, 2014, which he later violated. Relevant to the issues raised herein, the Commonwealth was permitted to present testimony from Ivy's prior ex-girlfriend, C.D., who alleged Ivy physically and sexually abused her during their relationship just months before he began dating A.C.

Ivy was subsequently arrested and charged with rape, kidnapping, aggravated assault, unlawful restraint, and simple assault.[5] Both parties filed pretrial motions in *limine* to obtain rulings on the admissibility of certain

---

[4] A.C. explained that Ivy strangled her with such force that the "upper half of [her] body was raised off of the bed." N.T., 11/17/2016, at 53.

[5] *See* 18 Pa.C.S. §§ 3121(a)(1), 2901(a)(3), 2701(a)(1), 2902(a)(1), and 2703(a)(1), respectively.

evidence at trial. For purposes of this appeal, we note the Commonwealth filed a motion in *limine* on June 26, 2015, seeking to introduce evidence of Ivy's prior bad acts pursuant to Pennsylvania Rule of Evidence 404(b)(2).[6] Specifically, the Commonwealth sought to present the testimony of C.D. concerning the prior verbal, physical, and sexual abuse Ivy subjected her to, as well as copies of PFA's obtained against Ivy by A.C., C.D., and another ex-girlfriend, M.F., and proof of Ivy's violations of those PFAs. *See* Commonwealth's Motion and Notice of Intent to Introduce Evidence of Other Crimes Pursuant to Pa.R.E. 404(b)(2), 6/26/2015, at ¶ 97. Following a hearing, on July 31, 2015, the trial court entered an order granting in part, and denying in part the Commonwealth's motion. Specifically, the court permitted the Commonwealth to present the testimony of C.D., and supporting documentation, regarding the abuse she suffered during her relationship with Ivy. However, the court denied the Commonwealth's motion to introduce certified copies of the PFA's, and violations thereof, obtained against Ivy by A.C., C.D. and M.F. *See* Order, 7/31/2015. Although the court later granted the Commonwealth's motion for reconsideration, it subsequently entered an identical order on September 10, 2015. The Commonwealth filed a timely, interlocutory appeal to this Court, challenging the trial court's

---

[6] Rule 404(b)(2) permits evidence of a defendant's prior bad acts for limited purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident[,]" but only "if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2).

preclusion of the PFA evidence. Ivy filed a cross-appeal, challenging the court's ruling permitting C.D. to testify about her prior relationship with him.

On August 19, 2016, a panel of this Court reversed that part of the trial court's order excluding the Commonwealth from presenting certified copies of both the PFAs obtained against Ivy, and his subsequent violations. **See Commonwealth v. Ivy**, 146 A.3d 241, 257 (Pa. Super. 2016). However, the panel quashed Ivy's cross-appeal as interlocutory. **See id.** The panel noted, "[i]n this situation, if [Ivy] ultimately is convicted, the trial court's decision to admit the evidence can be reviewed through [Ivy's] right to a direct appeal; thus, the claim will not be lost." **Id.** at 256.

Upon remand, the case proceeded to a jury trial. On November 18, 2016, the jury returned a verdict of guilty on all charges. That same day, the court ordered a pre-sentence investigation report, and directed the Sexual Offender Assessment Board ("SOAB") perform an assessment of Ivy to determine if he met the criteria for classification as an SVP. **See** 42 Pa.C.S. § 9799.24. On March 14, 2017, the court conducted a combined SVP and sentencing hearing. The trial court agreed with the SOAB assessment that Ivy met the criteria for classification as an SVP, and sentenced him to an aggregate term of 19 to 60 years' imprisonment. Specifically, the court imposed a sentence of 96 months' to 20 years' incarceration for rape, and two consecutive terms of 66 months' to 20 years' incarceration for kidnapping and aggravated assault. Ivy filed a timely post-sentence motion on March 23, 2017, challenging the weight and sufficiency of the evidence, the court's ruling

permitting Rule 404(b)(2) evidence regarding Ivy's prior assault of C.D., and the discretionary aspects of his sentence. The next day, Ivy filed a *pro se* motion seeking new counsel.[7] The court granted Ivy's request, and appointed new counsel, who filed an amended post-sentence motion on May 15, 2017. The amended petition incorporated by reference the earlier petition, and raised a new claim that the Commonwealth committed prosecutorial misconduct. **See** Motion to Amend Post Sentence Motion, 5/15/2017, at 1-2. Following a hearing conducted on June 30, 2017, the trial court denied Ivy relief on August 18, 2017. This timely appeal followed.[8]

In his first issue, Ivy argues the evidence was insufficient to support his convictions of rape, kidnapping and aggravated assault. **See** Ivy's Brief at 13-19.

_____

[7] Ivy cited a conflict of interest as the basis for his request; namely, he filed a civil suit against counsel in federal court. **See** Motion for Appointment of New Counsel, 3/24/2017, at 1.

[8] On September 18, 2017, the trial court ordered Ivy to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Ivy complied with the court's directive, and filed a concise statement on October 6, 2017. However, on October 19, 2017, the court directed Ivy to file a more specific Rule 1925(b) statement. Accordingly, Ivy filed an amended statement on October 27, 2017. The trial court filed an opinion on February 26, 2018.

Ivy's original appeal, however, was dismissed by this Court when he failed to file a brief. **See** 1328 WDA 2017, Order, 7/17/2018. On July 30, 2018, counsel filed a motion to reinstate the appeal *nunc pro tunc*, which the court granted on August 1, 2018. Subsequently, counsel filed a new notice of appeal on August 20, 2018. The trial court filed a supplemental opinion on November 12, 2018, which directed this Court to its prior opinion filed on February 26, 2018.

When reviewing a challenge to the sufficiency of the evidence, we must consider the following:

> [W]hether[,] viewing all the evidence admitted at trial in the light most favorable to the [Commonwealth as the] verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.

*Commonwealth v. Gonzalez*, 109 A.3d 711, 716 (Pa. Super. 2015) (citation omitted), *appeal denied*, 125 A.3d 1198 (Pa. 2015). We will consider his convictions *seriatim*.

First, Ivy was convicted of rape under subsection 3121(a)(1), which required the Commonwealth to prove he engaged in sexual intercourse with A.C. "[b]y forcible compulsion." 18 Pa.C.S. § 3121(a)(1). "[F]orcible compulsion" does not only include compulsion by use of physical force, but also "intellectual, moral, emotional or psychological force, either express or implied." 18 Pa.C.S. § 3101.

With respect to this conviction, Ivy emphasizes A.C. testified she agreed to have sex with him, and, in fact, took off her own clothes. *See* Ivy's Brief at 16. Although she claimed she was afraid because of the physical abuse he inflicted earlier that evening, Ivy notes the alleged rape occurred "a few hours"

later, after he and A.C. were laughing and making out. *Id.* at 17. Furthermore, he insists that even if A.C. believed he might use force against her if she refused to have sex with him, "there is no evidence that [he] intended to use force or the threat of force to compel [her] to have sexual intercourse with him." *Id.* Ivy also argues that while the Commonwealth may want to establish he used psychological force through the testimony of their expert witness and C.D., to show his pattern of such abuse, Ivy maintains "there are different circumstances between the two relationships" he had with the women. *Id.* He emphasizes he dated C.D for months and had several fights with her, while he dated A.C. for a mere few weeks and they only fought on the night in question. *See id.*

After painstakingly detailing the evidence presented at trial, the trial court concluded: "Obviously, the jury found that [A.C.] was actually compelled against her will to engage in sexual intercourse with [Ivy] out of fear, based upon the preceding choking incident and his overall demeanor." Trial Court Opinion, 2/26/2018, at 28. Upon our review of the record, we find no basis to disagree.

The jury was presented with substantial testimony concerning A.C.'s relationship with Ivy, including the fact that A.C. hoped to "patch things up" with him when she went to his house the night in question, despite their nasty online fight. N.T., 11/17/2016, at 31 (A.C. stated: "It's easy I guess to say hurtful things over the Internet but maybe face to face he would have a change of heart."). A.C admitted she laughed and joked with Ivy about the

assault after it occurred, she agreed to have sex with him, and she did not call the police when he left the room.[9] **See id.** at 56, 58, 76. However, A.C. also testified she believed "if [she] stayed calm," Ivy would stop abusing her. **Id.** at 55. She explained she "felt that [she] had no other choice" but to have sex with him, because if she refused him, "he could have taken it from [her] forcefully." **Id.** at 56. **See also id.** at 99 ("I was afraid that he would take it from me forcefully or hurt me further so I agreed just so that I wouldn't get hurt any more."). The jury had the opportunity to hear A.C.'s explanation for her seemingly contradictory behavior, and credited her testimony. Furthermore, Ivy disregards A.C.'s testimony that he would not permit her to leave his room both before and after he physically abused her. **See id.** at 50 (A.C. testified that after he tried to kick her, he told her she "wasn't leaving" and "pushed [her] with an open hand like on [her] chest … back onto the bed."); 55 (A.C. stated that after he stopped physically abusing her, she told him she wanted to leave and "he told [her] he couldn't let [her] leave in that emotional state."). Under the circumstances presented herein, we agree with the trial court that the evidence was sufficient to convict Ivy of rape by psychological/emotional forcible compulsion. **See** 18 Pa.C.S. § 3101.

Ivy also challenges his conviction of kidnapping. Section 2901(a)(3) of the Crimes Code, provides, *inter alia*, "a person is guilty of kidnapping … if he

---

[9] Under cross-examination, A.C. stated she joked about Ivy hitting and choking her "to keep it from getting serious again[.]" N.T., 11/17/2016, at 76. She explained, "I guess it's kind of my personality to joke about it so it didn't get back to a point where I would be afraid for my life." **Id.**

unlawfully confines another for a substantial period in a place of isolation, …
[t]o inflict bodily injury on or to terrorize the victim or another." 18 Pa.C.S. §
2901(a)(3). Here, Ivy insists the Commonwealth did not demonstrate that he
"confined her for a substantial period of time" or that he kept her "isolated."
Ivy's Brief at 18. Instead, Ivy contends the evidence demonstrated "the fight
happens at 7:00 p.m. they are laughing, playing music, and having sexual
intercourse by 11:00 p.m." *Id.* Moreover, he emphasizes the room locked
from the inside, A.C. had her cell phone with her, which she could have used
to call for help when he left the room, and she did, in fact, leave the bedroom
to use the bathroom. *See id.*

Again, Ivy's argument ignores A.C.'s testimony concerning his behavior
both before and after the rape. Although A.C. was able to leave the bedroom
to use the bathroom, she testified that when she was about to shut the
bathroom door, Ivy came in and pushed the door open. *See* N.T.,
11/17/2016, at 56. When asked why she did not simply run out the front
door, A.C. explained she had no shoes or keys. Furthermore, although Ivy
left her in the bedroom alone to hang out with his roommate in the living
room, he told her "don't try to leave, the dogs will hear you." *Id.* at 57. A.C.
also decided not to call the police because she did not know if they could enter
the home without permission. She stated:

> If he seen the cops, he could have thought to himself well, might
> as well do more damage since they are here. He could have hid
> me, he could have killed me, so I though it's in my best interest
> to just stay there, stay calm and not call the cops.

*Id.* at 58. Accordingly, based upon A.C.'s testimony, the evidence was sufficient for the jury to conclude Ivy isolated A.C. in his bedroom against her will for a substantial period of time in order to abuse and terrorize her. Therefore, his challenge to his kidnapping conviction fails.

With respect to aggravated assault, Ivy was convicted under Section 2701(a)(1), which requires the Commonwealth to prove "he … attempt[ed] to cause serious bodily injury to another, or cause[d] such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life[.]" 18 Pa.C.S. § 2702. Ivy argues the evidence did not establish he was "creating a risk of death" when he strangled A.C., but rather, only that he was "causing her pain." Ivy's Brief at 19. He contends "[t]he only reason that [A.C.] did not black out sooner is because [he] was not using the amount of force to make her lose consciousness[,]" and she did not have to be "medically treated for this choking[.]" *Id.*

Ivy's challenge to his aggravated assault conviction is specious. He contends that because he did not choke her to death, the jury could not find he attempted to cause her serious bodily injury. The reason Ivy stopped choking A.C. **before** he applied pressure for enough time to cause her death is irrelevant. She testified that while she did not lose consciousness, she started "to maybe black out," and the force he used was so great that "[i]t was enough to where the upper half of [her] body was raised off of the bed." N.T., 11/17/2016, at 53, 104. Moreover, the Commonwealth's expert forensic pathologist opined that the bruises on A.C.'s neck were consistent with her

account of the incident, and that a person who is manually strangled can lose consciousness in as little as five to 10 seconds. **See id.** at 117-118, 122. Therefore, we find the evidence was sufficient to demonstrate Ivy attempted to cause serious bodily injury to A.C. Accordingly, Ivy's challenge to the sufficiency of the evidence supporting his convictions is meritless.

Next, Ivy argues his convictions were against the weight of the evidence.[10] **See** Ivy's Brief at 20-21. Our review of such a challenge is well-settled:

> When reviewing a challenge to the weight of the evidence, we review the trial court's exercise of discretion. A reversal of a verdict is not necessary unless it is so contrary to the evidence as to shock one's sense of justice. The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none or some of the evidence and to determine the credibility of the witnesses. The fact-finder also has the responsibility of resolving contradictory testimony and questions of credibility.

**Commonwealth v. Roane**, 204 A.3d 998, 1001 (Pa. Super. 2019) (internal punctuation and citations omitted).

We find Ivy's argument on this issue lacking to such a degree that the claim is waived. His one-paragraph argument on this claim is as follows:

> The Appellant adopts the argument from the first section of his brief and incorporated it by reference as if fully set forth herein. The only addition the Appellant asserts is that the judgment of guilt is so contrary to the evidence as to shock one's sense of justice. There is no rape because AC consents to sexual intercourse. AC cannot be kidnapped because she is free to go

_____

[10] We note Ivy properly preserved this claim by raising it in a timely filed post-sentence motion. **See** Pa.R.Crim.P. 607(A)(3); Post-Sentence Motion, 3/23/2017, at ¶ 7.

and is not isolated. Finally, there is no evidence that the Appellant was trying to risk death or serious bodily injury. Please see argument section one.

Ivy's Brief at 21. Significantly, Ivy fails to explain how the trial court abused its discretion in denying his challenge to the weight of the evidence. *See* *Roane*, *supra*. The Pennsylvania Supreme Court has held:

> [W]hile a person convicted of a crime is guaranteed the right to direct appeal under Article V, Section 9, of the Pennsylvania Constitution, where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived. It is not the obligation of this Court, even in a capital case, to formulate Appellant's arguments for him.

*Commonwealth v. Johnson*, 985 A.2d 915, 924 (Pa. 2009), *cert. denied*, 562 U.S. 906 (2010). Accordingly, Ivy's challenge to the weight of the evidence is waived.[11]

In his final claim, Ivy contends the trial court erred or abused its discretion in denying his post-sentence motion alleging three incidents of prosecutorial misconduct.[12] *See* Ivy's Brief at 21. When considering a claim

---

[11] We note that even if we were to conclude the claim was not waived, we would affirm this issue on the basis of the trial court's opinion. *See* Trial Court Opinion, 2/26/2018, at 28-30.

[12] Ivy lists four purported incidents of prosecutorial misconduct in his brief. *See* Ivy's Brief at 21-25. However, his claim that the Commonwealth misled the jury during closing arguments was not included in his Pa.R.A.P. 1925(b) concise statement. *See* Amended Concise Statement of Matters Complained of on Appeal, 10/27/2017, at 1-2. Therefore, it is waived on appeal. *See* Pa.R.A.P. 1925(b)(4)(vii). Nevertheless, we note that even if we were permitted to address this claim on appeal, we would conclude it is waived because Ivy failed to object to the purported misleading statement during the Commonwealth's closing argument at trial. *See* N.T., 11/18/2016, at 69-96.

of prosecutorial misconduct, "[o]ur standard of review … is limited to whether the trial court abused its discretion." **Commonwealth v. Melvin**, 103 A.3d 1, 26 (Pa. Super. 2014) (citations omitted). Furthermore, "[i]t is within the discretion of the trial court to determine whether a defendant has been prejudiced by misconduct or impropriety to the extent that a mistrial is warranted." **Id.** (citation omitted).

First, Ivy asserts the Commonwealth "tampered with" a recording of an argument between him and his former girlfriend, C.D. **See id.** at 22. He insists "another male voice [was] placed in the recording" and counsel "should have had the tape checked for authenticity." **Id.**

The trial court addressed this allegation as follows:

> [Ivy] claims that a few words on a 45 minute audio recording by [C.D.] of their conversation on April 10, 2014 after going to a swing dance were altered. This recording was played to the jury and was admitted without objection as Com. Ex. 6. [Ivy] testified at the evidentiary hearing that at trial he heard the male voice say something like "don't blame her" at the 29 minute mark of the recording and it was not his voice. At trial, [C.D.] testified that the male voice on the recording was [Ivy] and nothing on cross examination indicated otherwise.
>
> In preparing this 1925 Opinion, the Court listened again (in camera) to Ex. 6 but the words "don't blame her" did not appear until the 30:32 minute of the recording during an argument obviously between [Ivy] and [C.D.] about another woman's possible attraction to [Ivy] at the swing dance. [C.D.] began making negative comments about this other woman's conduct, and [Ivy] became agitated on the recording and said: "Don't dare blame her. You're an idiot."
>
> Moreover, the tone of the voice was consistent in the recording and there were no discernable pauses, clicks or other disruptions in the male voice that would indicate the recording was dubbed at that point or altered in anyway. In addition, [Ivy]

- 14 -

conceded that it was merely "plausible it could have been doctored." Accordingly, the Court finds that this claim of prosecutorial misconduct is totally specious.

Trial Court Opinion, 2/26/2018, at 32-33.

We find no basis to disagree with the court's ruling. First, it is clear that Ivy waived this claim when he failed to object to the recording at trial. **See** N.T., 11/16/2016, at 77-78. **See also Commonwealth v. Rodriguez**, 174 A.3d 1130, 1145 (Pa. Super. 2017) ("The absence of a contemporaneous objection below constitutes a waiver of the claim on appeal.") (citation and internal punctuation omitted), *appeal denied*, 186 A.3d 941 (Pa. 2018). Moreover, as the trial court explained, Ivy failed to demonstrate that the tape was even altered. Accordingly, no relief is warranted.

Second, Ivy insists the Commonwealth failed to provide the defense with exculpatory evidence, in particular, text messages on his cell phone, which was seized by the police. **See** Ivy's Brief at 23. He complains the Commonwealth "only turned over a portion of [his] text messages" and did not provide certain messages "that would have aided in his defense." **Id.** Specifically, he maintains the text messages would have revealed that C.D. told Ivy she "knows [he] won't hurt her" and her visit to a chiropractor was not the result of any physical abuse by him. **Id.** Ivy asserts "[t]his evidence is located in [his] cell phone which is still in the possession of the Commonwealth." **Id.**

The trial court concisely disposed of this claim by noting that Ivy "presented no evidence that any such text messages were sent, saved and or

capable of being retrieved on his cell phone, nor that his attorney was not given all retrieved texts." Trial Court Opinion, 2/26/2018, at 32. We agree. Furthermore, we emphasize Ivy did not raise this claim either before or during trial, despite the fact that he would have been aware that these purportedly exculpatory messages were not provided to him during discovery. Thus, this claim, too, fails.

Third, Ivy contends the Commonwealth "fabricated evidence" and permitted "perjured testimony" to convince the trial court to allow C.D. to testify at trial. Ivy's Brief at 24. In particular, he argues the Commonwealth knew there was "inconsistencies" in C.D.'s testimony concerning Ivy's alleged abuse. *Id.* Ivy maintains this is evident by the fact C.D. was able to provide a detailed account of his sexual and physical abuse of her at trial, but later, when the Commonwealth charged him with crimes against C.D., he received a reduced plea because C.D. "did not recall facts of the case." *Id.* He insists the Commonwealth knew C.D. was "perjuring her testimony" at the present trial. *Id.*

The trial court addressed this allegation of prosecutorial misconduct as follows:

> [Ivy] next claims that the use of [C.D.] as a Rule 404(b) witness at trial constitutes intentional prosecutorial misconduct. This claim appears to be based on evidence discovered after the verdict in this case on November 18, 2016. [Ivy] was facing 45 criminal charges, including rape as to [C.D.] (1513 Crim. 2016) at the same time as this case. However, in [C.D.'s] case, [Ivy] was initially charged in 2014 with simple assault and harassment, but no sexual assault crimes, and entered a negotiated guilty plea. He was then charged soon thereafter with the charges in the

pending [C.D.] case. [Ivy's] attorney moved for dismissal of these 45 charges before the Honorable Robert G. Yeatts based on double jeopardy grounds.

[Ivy] represented at the evidentiary hearing on his prosecutorial misconduct claim that he learned at the double jeopardy hearing on March 8, 2017[,] for the first time the reasons behind the plea bargain of the physical assault charges regarding [C.D.] [Ivy] testified that Assistant District Attorney Tyler Heckathorn represented at the double jeopardy hearing that he agreed to a plea bargain because [C.D.] could not recall details, such as times or dates, and that she was reluctant to testify. [Ivy] also claims the prosecution team therefore knew she was not a reliable witness and that she was a "perjuring witness." Thus, [Ivy] contends that the use of [C.D.] as a [Rule] 404(b) witness in the [present] rape trial was prosecutorial misconduct because the prosecutors knew she was unreliable and reluctant.

[Ivy's] argument on this factual basis is likewise deficient. In the first instance, except for [Ivy's] own testimony, the full reasons ADA Heckathorn entered into a plea bargain are unknown to this Court. [Ivy] failed to fully develop the record, such as presenting a transcript from the double jeopardy hearing nor call Mr. Heckathorn or anyone else to substantiate his testimony, which is critical, because [Ivy] lacks credibility with the Court. Even if the initial assault charges were dropped because of [C.D.'s] unwillingness to testify or faulty recall at the time of the preliminary hearing, that does not mean that a victim of multiple physical and sexual assaults cannot later decide to cooperate upon learning of the second victim, [A.C.], which may have happened here, or for any other reason. Prosecutors often deal with reluctant victims and witnesses as well as witnesses who initially claim they do not recall many details but later testify at great length. That is a frequent struggle for all prosecutors. Absent evidence that the prosecution knew that a witness was lying, the mere fact of a later improved memory or willingness to testify by a witness, does not support a claim of misconduct. Moreover, [C.D.] was subject to cross examination at trial and confrontation with any prior inconsistent statements or omissions to impeach her credibility. One only need to read her testimony, in conjunction with the Commonwealth's expert on victim behavior, to understand why she may have been a reluctant witness - she had been physically and sexually assaulted over a 60 day period.

Thus, the Court finds that [Ivy] has not produced sufficient evidence to demonstrate that the government failed to turnover any **Brady**[13] material, or that it intentionally presented testimony and evidence that it knew to be false or so unreliable, yet prejudicial, that it would fix bias and hostility into the minds of the jury so they could not objectively weigh all of the evidence to determine if the Commonwealth met its burden of proving [Ivy] guilty on all of the charges regarding [A.C.]

Trial Court Opinion, 2/26/2018, at 35-37 (record citations omitted).

We find no basis to disagree with the well-reasoned decision of the trial court. Although Ivy did include a copy of the March 8, 2017, "double jeopardy" hearing transcript involving the charges for his assault of C.D. in the reproduced record, we note that "our review is limited to those facts which are contained in the certified record" and a document that is not included in the certified record "does not exist for purposes of our review." **Commonwealth v. O'Black**, 897 A.2d 1234, 1240 (Pa. Super. 2006). Furthermore, the reasons for the delayed prosecution involving C.D.'s allegations, absent an admission that she fabricated the claims, are irrelevant here. Ivy has presented no evidence demonstrating that (1) C.D. lied during the trial at issue, and (2) the Commonwealth knew this to be so. Accordingly, Ivy's claims of prosecutorial misconduct entitle him to no relief.

Although we have rejected all of the contentions raised by Ivy on appeal, we are compelled to address another issue *sua sponte*. As noted above, Ivy was designated as an SVP at the time of his original sentencing. Although he has not challenged this designation on appeal, we may consider claims

---

[13] **Brady v. Maryland**, 373 U.S. 83 (1963).

affecting the legality of a sentence *sua sponte*.  ***See Commonwealth v. Butler***, 173 A.3d 1212, 1214 (Pa. Super. 2017), *appeal granted*, 190 A.3d 581 (Pa. 2018).

In ***Commonwealth v. Muniz***, 164 A.3d 1189 (Pa. 2017), the Pennsylvania Supreme Court held SORNA's registration provisions constitute punishment, and, therefore, the retroactive application of those provisions violates the *ex post facto* clauses of the federal and Pennsylvania constitutions.  Thereafter, in October of 2017, a panel of this Court, in ***Butler***, ***supra***, relying upon ***Muniz***, ***supra***, concluded SORNA's statutory mechanism for designating a defendant as an SVP, as set forth in 42 Pa.C.S. § 9799.24(e)(3), was "constitutionally flawed" because it permits a trial court to make the determination based upon clear and convincing evidence.  ***Id.*** at 1218.  Accordingly, the ***Butler*** Court held "trial courts may no longer designate convicted defendants as SVPs, nor may they hold SVP hearings, until our General Assembly enacts a constitutional designation mechanism."[14]

_____

[14] As noted above, the Pennsylvania Supreme Court granted allowance of appeal in ***Butler*** on the following claim:

> Whether the Superior Court of Pennsylvania erred in vacating the trial court's Order finding [Respondent] to be [a Sexually Violent Predator ("SVP")] by extrapolating the decision in [***Commonwealth v. Muniz***, 640 Pa. 699, 164 A.3d 1189 (2017),] to declare SVP hearings and designations unconstitutional under 42 Pa.C.S. § 9799.24(e)(3).

***Commonwealth v. Butler***, 190 A.3d 581, 582 (Pa. 2018).  At this time, however, the ***Butler*** decision is controlling.

*Id.* In line with its holding, the panel vacated the order designating the defendant as an SVP, and remanded the case to the trial court to determine his proper registration period pursuant to 42 Pa.C.S. §§ 9799.14 and 9799.15. *See id.*

Therefore, here, we are likewise constrained to vacate that portion of the judgment of sentence regarding Ivy's SVP designation and SORNA reporting requirements. Furthermore, we remand the case to the trial court to determine the appropriate registration and reporting requirements for Ivy.[15] In all other respects, we affirm the judgment of sentence.

Judgment of sentence affirmed in part and vacated in part solely as to SVP designation and SORNA reporting requirements. Case remanded for proceedings consistent with this memorandum. Jurisdiction relinquished.

President Judge Emeritus Bender joins this memorandum.

Judge Strassburger files a concurring memorandum.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/30/2019

---

[15] We note that following the decisions in *Muniz* and *Butler*, the Pennsylvania General Assembly enacted legislation to amend SORNA. *See* Act of 2018, Feb. 21, 2018, P.L. 27, No. 10 ("Act 10").

- 20 -